IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                    Criminal No. 3:20CR35

FAHEEM ALI JORDAN

## MEMORANDUM OPINION

Faheem Ali Jordan, a federal inmate proceeding with counsel, submitted this AMENDED MOTION TO VACATE GUILTY PLEA, CONVICTION AND SENTENCE UNDER 28 U.S.C. § 2255 ("§ 2255 Motion," ECF No. 89).[1] Jordan contends that he entitled to have his guilty plea and conviction set aside because a law enforcement officer involved in his case, Detective Sprouse, subsequently engaged in misconduct in a separate, unrelated case. The Government has responded. For the reasons set forth below, the § 2255 Motion will be denied.

## I.  PROCEDURAL HISTORY

On February 10, 2020, Jordan was charged in a Criminal Complaint with distribution of mixture and substance containing heroin and fentanyl. (ECF No. 1.) Thereafter, on March 3, 2020,

---

[1] The Court employs the pagination assigned to the parties' submissions by the CM/ECF docketing system. The Court corrects the spelling, punctuation, capitalization, and spacing in the quotations from the parties' submissions.

Jordan was charged in a seven-count Indictment with: distribution of heroin and fentanyl (Counts One, Two, and Four); distribution of cocaine (Counts Three); possession with intent to distribute cocaine base (Count Six); and, possession with intent to distribute heroin and fentanyl (Count Seven). (ECF No. 10, at 1-2.)

On June 24, 2020, Jordan filed a motion to suppress with respect to the drugs, firearm, and cash seized pursuant to a search warrant executed at 673 Westover Woods Circle, Richmond, Virginia. (ECF No. 18, at 1.) "The above-mentioned address that was the subject of the search warrant belonged to Jordan's father, Fernando Jordan . . . ." (Id.) Jordan argued:

> The inability of the Richmond Police Narcotics Unit to effectively see Jordan's movements inside the Westover Woods residence precludes . . . Jordan from being deemed to have constructively possessed any contraband found therein. There is no evidence that Jordan knew where the contraband was located in the home, that Jordan exercised his will and control over the contraband found therein or that Jordan was even aware of the existence of the contraband found therein.
> WHEREFORE for the foregoing reason, Faheem Ali Jordan respectfully requests this Court to strike any association of the contraband found in 673 Westover Woods Circle, Richmond Virginia to him in any way. . . .

(Id. at 3.) The Court conducted a hearing on the motion on August 5, 2020 and denied the motion. (ECF No. 26, at 1.)

On November 10, 2020, Jordan pled guilty to Count One of the Indictment which charged that:

> On or about May 9, 2019, in the Eastern District of Virginia and within the jurisdiction of this Court, the defendant, FAHEEM ALI JORDAN did knowingly, intentionally and unlawfully distribute a mixture and substance containing a detectable amount of the heroin a Schedule I controlled substance and fentanyl, a Schedule II controlled substance.

(ECF No. 10, at 1-2; ECF Nos. 42, at 1; ECF No. 67, at 1.)   In conjunction with that plea, Jordan agreed the Government "would have proven the following facts beyond a reasonable doubt with admissible and credible evidence" had the matter proceed to trial:

> 1.    On or about May 9, 2019, in the Eastern District of Virginia and within the jurisdiction of this Court, the defendant did knowingly, intentionally and unlawfully distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance.
> 2.    On May 9, 2019, in Chesterfield County, Virginia, the defendant sold 29.6 grams of a mixture and substance containing both heroin and fentanyl to a person secretly working for the police.
> 3.    On June 13, 2019, in Chesterfield County, Virginia, the defendant sold 14.32 grams of a mixture and substance containing both heroin and fentanyl and 27.58 grams of a mixture and substance containing cocaine hydrochloride to a person secretly working for the police.
> 4.    On July 18, 2019, in Henrico County, Virginia, the defendant was in an automobile wreck while operating a rental vehicle he had rented.  The vehicle was removed from the scene by a tow truck. Subsequently, 17.9 grams of cocaine base, 16.37 grams of a mixture of heroin and fentanyl and a digital

3

scale with cocaine residue were recovered from
defendant's rental vehicle.

5. On August 21, 2019, in Chesterfield County,
Virginia, the defendant sold 12.77 grams of a mixture
and substance containing both heroin and fentanyl and
28.37 grams of a mixture and substance containing
cocaine hydrochloride to a person secretly working for
the police.

6. On September 26, 2019, the defendant was
arrested in the City of Richmond, Virginia and was
found to be in possession of 53.75 grams of a mixture
and substance containing cocaine base and 27.95 grams
of a mixture and substance containing both heroin and
fentanyl. Defendant possessed these quantities of
controlled substances with the intent to distribute
them. Additionally, defendant had $1,607.65 in U.S.
currency on his person and a digital scale with
residue in his vehicle.

7. Also on September 26, 2019, a search warrant
was executed at defendant's newly acquired residence
in Chesterfield County, which resulted in the recovery
of approximately $32,000 in drug proceeds, [and] 665.7
grams of cutting agent commonly used in the
distribution of cocaine, heroin and fentanyl[.]

(ECF No. 41, at 1-2.)

On May 7, 2021, the Court sentenced Jordan to 151 months of

imprisonment. (ECF No. 66, at 1.)

## II.   JORDAN'S § 2255 MOTION

In his § 2255 Motion, Jordan contends that the Court must

vacate a defendant's "guilty plea when it is established that

. . . the [defendant] would not have pled guilty if the

[defendant] had been aware of the government misconduct by an

officer in the case." (ECF 90, at 2 (emphasis omitted).) Here,

Jordan notes that in 2022, it was "discovered that a Special

4

Prosecutor has been appointed to investigate the fact that Detective Sprouse may have falsified search warrant in at least seven drug and firearm investigations . . . ."   (Id. at 4 (citation omitted).)

### III.   ANALYSIS

Jordan compares his case to United States v. Fisher, 711 F.3d 460 (4th Cir. 2013) and contends that he is entitled to relief.   The United States Court of Appeals for the Fourth Circuit introduced that case by stating:

> In this extraordinary case, [Detective Lunsford,] the law enforcement officer responsible for the investigation that led to the defendant's arrest and guilty plea himself later pled guilty to having defrauded the justice system in connection with his duties as an officer. Regarding this case specifically, the officer admitted to having lied in his sworn affidavit that underpinned the search warrant for the defendant's residence and vehicle, where evidence forming the basis of the charge to which the defendant pled guilty was found. We hold that the officer's affirmative misrepresentation, which informed the defendant's decision to plead guilty and tinged the entire proceeding, rendered the defendant's plea involuntary and violated his due process rights.

Id. at 462.

In reaching that conclusion, the Fourth Circuit concluded that Detective Lunsford's "pre-plea misconduct rendered" Fisher's plea involuntary under Brady v. United States, 397 U.S.

742 (1970).  Id. at 464.  According to the Fourth Circuit, under

Brady v. United States,

> to set aside a plea as involuntary, a defendant who
> was fully aware of the direct consequences of the plea
> must show that (1) "some egregiously impermissible
> conduct (say, threats, blatant misrepresentations, or
> untoward blandishments by government agents) antedated
> the entry of his plea" and (2) "the misconduct
> influenced his decision to plead guilty or, put
> another way, that it was material to that choice."

Id. at 465 (quoting Ferrara v. United States, 456 F.3d 278, 290

(1st Cir. 2006)).[2]

In concluding Fisher satisfied the first element, the

Fourth Circuit observed:

> This case presents highly uncommon circumstances
> in which gross police misconduct goes to the heart of
> the prosecution's case.  Lunsford falsely testified in
> his sworn search warrant affidavit that he targeted
> Defendant after a reliable confidential informant told
> him that Defendant distributed narcotics from his
> residence and vehicle and had a handgun in his
> residence.  Lunsford identified the confidential
> informant in his affidavit, and he averred that the
> informant identified Defendant in a photograph and
> provided Lunsford with Defendant's physical
> description, address, and vehicle information.  On the
> basis of that affidavit, Lunsford secured a search
> warrant.  That warrant enabled the search of
> Defendant's home, where evidence forming the basis of

---

[2] Justice Agee dissented from the notion that United States
v. Brady provided Fisher with an avenue for relief.  United
States v. Fisher, 711 F.3d 460, 476 (4th Cir. 2013) (Agee, J.,
dissenting) ("But the majority opinion cites no authority for
the proposition that police misconduct, happening months before
the entry of the guilty plea and devoid of any direct inducement
of that plea, must be attributed to the prosecution for purposes
of Fisher's stand alone prosecutorial misconduct claim relying
on Brady v. United States.")

6

the charge to which he pled guilty was found.  After
Defendant was charged, the prosecution provided
Lunsford's affidavit to Defendant, who relied on it in
deciding whether to plead guilty.  Over a year after
Defendant pled guilty, Lunsford himself pled guilty to
fraud and theft offenses and admitted that the
confidential informant he identified in his affidavit
"had no connection to the case."

Id. at 466 (citation omitted).

With respect to the second element, the Fourth Circuit
noted that a defendant "must show 'a reasonable probability
that, but for the misconduct, he would not have pleaded guilty
and would have insisted on going to trial.' Courts take an
objective approach to determining reasonable probability."   Id.
at 467 (internal citation omitted) (quoting Ferrara, 456 F.3d at
294.)  In concluding that Fisher had satisfied this element, the
Fourth Circuit relied heavily upon the declaration of Fisher's
trial counsel, who swore:

[h]aving fully reviewed [Defendant's] file and the
information that I now know about Mark Lunsford, I can
state with full confidence that my approach to
[Defendant's] case in 2007 and 2008 would have been
entirely different had I known then what I know now.
I would have advocated strongly for a different
outcome for the case.  The options I would have sought
in good faith range from an outright dismissal, to a
dismissal in lieu of state prosecution, to a plea in
federal court to a significantly lower sentence. Were
negotiations with [the prosecution] not successful, I
would have sought to suppress the evidence against
[Defendant], including filing a motion to suppress and
seeking a Franks hearing.  Were we to lose at such a
hearing, I would have advised [Defendant] that a key
consideration in deciding whether to enter a guilty
plea or proceed to trial was the role that Officer

7

> Lunsford's credibility would play at trial.  I believe
> . . . that I very likely would have obtained a better
> result than the 10 year sentence I advised [Defendant]
> to accept in 2008.

Id. at 468 (alterations in original)(citation omitted).

> The Fourth Circuit concluded that:

> Given the totality of the circumstances of this case—a
> law enforcement officer intentionally lying in a
> affidavit that formed the sole basis for searching the
> defendant's home, where evidence forming the basis of
> the charge to which he pled guilty was found—
> Defendant's plea was involuntary and violated his due
> process rights.

Id. at 469.

As explained below, Jordan fails to demonstrate any "egregiously impermissible conduct," such as "blatant misrepresentations . . . by government agents) antedated the entry of his plea." Id. at 465 (quoting Ferrara, 456 F.3d at 290).  Furthermore, even assuming that Detective Sprouse's subsequent misconduct in an unrelated case satisfies the first element, Jordan fails to demonstrate any reasonable probability that he would have pled not guilty.

## A.  Egregious Government Misconduct

### 1.  Detective Sprouse's Subsequent Misconduct

The Government has provided a copy of the Complaint filed against Detective Sprouse in the Circuit Court for Chesterfield

County, Virginia charging him with Malfeasance in Office. (ECF
No. 94-5.) That Complaint states in pertinent part:

> In February 2022, Senior Detective Robert W.
> Sprouse was the lead detective for a complex narcotics
> investigation that was primarily located in
> Chesterfield County, Virginia. In furtherance of his
> investigation, Det. Sprouse obtained search warrants
> for the real-time GPS locations of devices associated
> with persons of interest to his
> investigation. . . . In the days leading up to
> Monday, February 14, 2022, Det. Sprouse requested an
> extension of time for the GPS search warrant; however,
> his request for an extension of time was denied by the
> Commonwealth's Attorney's Office. Det. Sprouse
> decided to seek seven (7) search warrants related to
> his investigation because the GPS search warrant was
> expiring and he did not want the targets to discover
> his investigation, which was a possibility.
> At the time, Det. Sprouse and the Narcotics Unit
> were very busy. In particular, many of the
> Chesterfield Narcotics Unit detectives were subpoenaed
> to testify in a serious jury trial in the City of
> Richmond on Tuesday, February 22, 2022. Preparation
> for a serious jury trial is very time-intensive.
> Execution of the seven (7) search warrants was also
> necessarily very time and resource intensive. The
> operation sought to seize inherently dangerous
> narcotics and firearms, requiring specialized teams of
> personnel for execution. The operation required
> multiple teams of officers in multiple locations in
> two jurisdictions. Extensive coordination was
> necessary for the simultaneous execution by all teams
> in all locations to minimize the opportunity to
> destroy evidence in any of the locations. In
> addition, coordination between courts, police, and the
> Commonwealth Attorney's Offices in both jurisdictions
> was necessary to prevent premature public disclosure
> of the facts necessarily contained in the affidavits,
> which can often be dangerous to confidential sources
> in narcotics cases. With an imminent time limitation,
> Det. Sprouse and the Narcotics Unit organized a
> complex operation for the simultaneous execution of
> seven (7) search warrants in two jurisdictions while

also preparing for a serious jury trial in the City of Richmond.

On Monday, February 14, 2022, as part of the complex and time-sensitive preparations for the operation, Det. Sprouse prepared and presented seven (7) search warrants and affidavits to Magistrate Wright-Lawson. Ordinarily, a detective prepares an affidavit and a magistrate prepares a search warrant; however, sometimes clerical errors occur when information is transcribed from an affidavit to a warrant, requiring the warrant to be returned to the magistrate for correction before execution. As a matter of common practice, some of the detectives prepared the search warrants along with affidavits. In the opinion of some, this practice was more effective in preventing transcription errors and preventing any necessity of returning to the magistrate to correct a clerical error before execution of the warrant. In most jurisdictions, when a judge issues a search warrant, the detective normally prepares the search warrant and affidavit because the judge does not have access to the search warrant template, as magistrates do. There is no requirement that a magistrate prepare a search warrant. Attempting to ensure more accurate and timely issuance of the requested search warrants, Det. Sprouse prepared the seven (7) search warrants along with the seven (7) affidavits before presenting all of the documents to Magistrate Wright-Lawson. In drafting the seven (7) search warrants, Det. Sprouse omitted any description of items authorized for seizure ("Scope of Search") on the face of each of the seven (7) search warrants; however, a description of the items that Det. Sprouse sought to seize was included in each of the seven (7) affidavits. The items that Det. Sprouse sought to seize are items that are routinely authorized for seizure in narcotics search warrants. Magistrate Wright-Lawson reviewed and considered the affidavits and search warrants and issued each of the seven (7) search warrants to Det. Sprouse for execution. In issuing the search warrants, Magistrate Wright-Lawson signed each of the seven (7) search warrants and attached each of the seven (7) affidavits to each search warrant by stapling the documents together, as is her routine.

At the time of issuance, nobody noticed the omission of the Scope of Search from the face of the

seven (7) search warrants.  Det. Sprouse prepared and reviewed the search warrants and affidavits before they were presented to Magistrate Wright-Lawson. Sergeant Nathan Ballantine of the Narcotics Unit also reviewed the search warrants and affidavits and did not notice the omission either.  Sgt. Ballantine is an experienced narcotics detective and a supervisor for the Narcotics Unit.  Magistrate Wright-Lawson did not notice the omission, and she affirms that the requested Scope of Search from the affidavits would have been included in the search warrants in its entirety had she noticed the omission.  Because of changes in the law in the last couple of years, the search warrant form has changed substantially.  The form is now busier and less familiar.  There is no evidence that anyone knew of the omission of the Scope of Search on the search warrant forms at the time of issuance.  There is no known reason to omit the Scope of Search from the face of the warrants.  The omission of the Scope of Search from the face of each of the seven (7) search warrants was a clerical error.

. . . .

On Wednesday, February 16, 2022, all seven (7) search warrants were simultaneously executed.  Teams of officers executed the warrants in multiple locations in two jurisdictions.  As is necessary and customary, the officers coordinated with each other and worked together as a team, each playing a role and trusting the work of the others.  In preparation for the operation, the teams of officers were briefed as to their individual roles in the operation.  The search teams were briefed to seize the items that were requested to be seized in the affidavits, which are items that are routinely authorized for seizure in narcotics search warrants.  The issued search warrants and attached affidavits were present at each of the locations during execution.  An officer at each of the locations reviewed the face of the issued search warrants to verify that the correct location was searched; however, no officer noticed the omission of the Scope of Search during the execution of the warrants.  Despite the omission of the Scope of Search from the warrants, the search teams only seized "items associated with the drug trade", as requested in the affidavits, which were attached to the search warrants at execution.

11

. . . .

On or about Friday, February 18, 2022, Senior Detective Robert W. Sprouse of the Chesterfield County Police Department added the Scope of Search language from the affidavits to the face of the seven (7) search warrants issued by Magistrate Wright-Lawson on February 14, 2022. The Code of Virginia defines the authority of an officer executing a search warrant. Det. Sprouse did not have any authority to add the Scope of Search language to any of the seven (7) search warrants that Magistrate Wright-Lawson issued to him for execution. In addition, Det. Sprouse did not have any discretion in the matter. . . . Using his computer in the office, Det. Sprouse typed the Scope of Search into the search warrant template, practiced a few drafts on scratch paper to make sure the alignment and spacing was correct when printed, and then printed the Scope of Search onto the original search warrants, which Magistrate Wright-Lawson signed on February 14, 2022. Because the Narcotics Unit was scheduled to be off duty, Det. Sprouse was relatively alone in the office space of the Narcotics Unit. It is not readily apparent, even upon close inspection, that Det. Sprouse printed the Scope of Search onto the original search warrants after execution. Det. Sprouse did not ask anyone if he could do so. Det. Sprouse did not tell anyone that he did so until after the discovery of the omission of the Scope of Search.

On Monday, February 21, 2022, Chief Magistrate Daniel Holser noticed the absence of the Scope of Search on one of the search warrants as part of his normal, routine review of search warrants in his supervisory capacity. After noticing the omission, he contacted Magistrate Wright-Lawson and confirmed the error with all seven (7) search warrants. Magistrate Wright-Lawson accepted responsibility for the error and explained that it was an oversight due to Det. Sprouse typing the search warrants, not her. The electronic template that magistrates use to populate a search warrant alerts the magistrate if a section of the warrant is not populated. Chief Magistrate Holser emailed Captain Johnathan Miller, CCPD, and the Chesterfield Commonwealth's Attorney's Office without delay, advising the Scope of Search was omitted from the search warrants.

. . . .

12

On Tuesday, February 22, 2022, at about 10:00 a.m., Det. Slusser took six (6) of the altered search warrants, which were in a folder on his desk with a sticky note from Det. Sprouse, obtained a judge's signature on a new sealing order, and then filed them in Chesterfield County Circuit Court. At Det. Sprouse's request for assistance, Det. Slusser signed each of the six (6) search warrant returns as the executing officer where it states, "The statement above is true and accurate to the best of my knowledge and belief." At the time, Det. Slusser was not aware that Det. Sprouse altered the six (6) search warrants by adding the Scope of Search. Det. Slusser received copies of the filed warrants from the court clerk and put them in a folder on Det. Sprouse's desk.

During the day, Det. Sprouse filed the remaining search warrant in the Circuit Court for the City of Richmond. Det. Sprouse and most of the Chesterfield Narcotics Unit were in Richmond Circuit Court for the jury trial. In contrast to Det. Slusser, Det. Sprouse did not sign the return for the search warrant that he altered and filed in Richmond, but merely printed his name on the return where it states, "The statement above is true and accurate to the best of my knowledge and belief." When the search warrant was issued, Det. Sprouse actually signed the affidavit for the search warrant. During the jury trial, Det. Sprouse was waiting to testify with Detective Greg Hopkins, CCPD. Det. Sprouse was reviewing emails on his phone, and his demeanor changed drastically. At the time, emails regarding the omitted Scope of Search were circulating. Det. Sprouse mentioned to Det. Hopkins that something was not transferred from the affidavit to the warrant, but he did not provide any details. Det. Hopkins advised Det. Sprouse that it sounded like a clerical error and something that could be addressed. To Det. Hopkins, it "looked like somebody sucked the soul out of him." Other detectives, unaware of what was going on, were teasing Det. Sprouse about his demeanor. Det. Sprouse did not mention altering the warrants in any way to anyone.

. . . .

On Wednesday, February 23, 2022, Sgts. McLaughlin and Ballantine met with Det. Sprouse about the search warrants in the morning. During the meeting, Det. Sprouse produced his case file and told his Sergeants

that he "ended up putting it on the return." Sgt.
McLaughlin examined the copies of the search warrants
in Det. Sprouse's case file. He was confused because
the search warrants contained the Scope of Search.
Sgt. McLaughlin asked Det. Sprouse where the original
search warrants were. Det. Sprouse told him that the
ones in his files were copies of the originals. Sgt.
McLaughlin asked how that is possible because the
Scope of Search was on the search warrants. Det.
Sprouse explained that he took the original search
warrants, put them in the printer, and printed only
the Scope of Search on the originals. Sgt. McLaughlin
reacted with shock. Det. Sprouse asked, "Did I fuck
up?" Det. Sprouse's demeanor changed drastically. He
repeatedly and passionately stated that he was just
trying to "fix" a clerical error. He said that he
thought it was a clerical error and that he was
correcting a clerical error. He was visibly upset and
cried. Det. Sprouse stated that he did not mean to
deceive anyone or maliciously do anything. The
Sergeants were unsure what exactly to say to Det.
Sprouse, but they told Det. Sprouse that he could not
alter a signed search warrant. Sgt. McLaughlin
explained that a signed search warrant must be
returned to the same magistrate for the magistrate to
correct and initial, "That's what we do." Det.
Sprouse apologized and lamented potentially losing the
respect of the unit. This is the first known time
that Det. Sprouse told anyone that he altered the
search warrants. After the meeting, Sgts. McLaughlin
and Ballantine relayed Det. Sprouse's admission to
altering the search warrants to the Commonwealth's
Attorney's Office and referred the incident to
internal affairs for investigation without delay.

    . . . .

    Det. Sprouse's reputation for honesty is
excellent. He is described by many as being of the
highest integrity and as being particularly careful,
meticulous and detail-oriented. There are no known
instances of any similar conduct to that described
above. There is no other known conduct that would
call his integrity into question. There is no known
person that would describe Det. Sprouse as dishonest.

(Id. at 1-6 (footnote omitted).)

Ultimately, the charge of Malfeasance in Office against Detective Sprouse, was dismissed because the Circuit Court concluded Malfeasance in Office no longer was a crime in Virginia. (ECF No. 94-7, at 3.)

### 2. Jordan Fails To Demonstrate Any Egregious Government Misconduct

There is no evidence that Detective Sprouse engaged in any misconduct in Jordan's case. Indeed, Jordan has failed to even advance any **allegations** that Detective Sprouse engaged in misconduct in his case. Given this omission, Jordan fails to demonstrate any "egregiously impermissible conduct. . . by government agents[] antedated the entry of his plea." Fisher 711 F.3d at 465 (quoting Ferrara, 456 F.3d at 290). Accordingly, for this reason alone Jordan's claim is subject to dismissal.

### B. Jordan Fails To Demonstrate A Reasonable Probability That He Would Have Pled Not Guilty

In Fisher, with respect to the second element, the defendant credibly argued that his "'entire approach to the case would have been different,' had he known about [the detective's] affirmative misrepresentation and felonious behavior" and provided a detailed explanation of the plausible strategies and defenses he would have employed. Id. at 467–68. In contrast, Jordan simply states:

15

> There is certainly a reasonable probability that Mr.
> Jordan may not have entered a guilty plea if he had
> been aware of Detective Sprouse's lying in drug
> investigations like Mr. Jordan's case. It may have
> affected how Mr. Jordan and his counsel dealt with
> their entire case: Asked for a <u>Franks</u> hearing and/or
> proceed to trial and consider challenging the
> credibility of Detective Sprouse's arrest and the
> evidence seized.

(ECF No. 90, at 4-5.)

Jordan, however, fails to articulate how he could credibly mount any defense to the evidence against him based on Detective Sprouse's misconduct. Jordan pled guilty to Count One, which charged him with distributing a mixture and substance containing heroin and fentanyl on May 9, 2019, to an individual secretly working for the police. (ECF No. 10, at 1.) Jordan fails to advance any explanation as to how Detective Sprouse's subsequent misconduct would allow him to challenge this charge. Similarly, Jordan fails to explain how Detective Sprouse's misconduct, occurring nearly three years later, would permit him to challenge his distribution of heroin and fentanyl to the individual working for the police that formed the basis for Counts Two and Four or any of the other crimes charged in the Indictment. Accordingly, Jordan fails to demonstrate any reasonably probability that he would have pled not guilty and insisted on going to trial in light of Detective Sprouse's

16

misconduct.   <u>Fisher</u>, 711 F.3d at 467.   Jordan's claim will be denied.

### IV.   CONCLUSION

The § 2255 Motions (ECF Nos. 84, 89) will be denied.   The action will be dismissed.   A certificate of appealability will be denied.   DEFENSE COUNSEL'S MOTION TO WITHDRAW (ECF No 97) will be granted.   Jordan's MOTION REQUESTING LEGAL REPRESENTATION (ECF No. 98) will be denied.

The Clerk is directed to send a copy of the Memorandum Opinion to Jordan and counsel of record.

It is so ORDERED.

/s/   _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 7 , 2024

17